## CONTINUATION OF APPLICATION FOR A SEARCH WARRANT

## INTRODUCTION

1.      I, Aaron Eastham, am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since 2018.  I am currently assigned to the Detroit Field Office, Grand Rapids Resident Agency. During my employment with the FBI, I have conducted investigations involving violations of federal criminal laws, including violations related to child exploitation, child pornography, and human trafficking. I am familiar with the various statutes of Title 18, United States Code, Chapter 77, including 18 U.S.C. § 1591, which prohibits the sex trafficking of minors and sex trafficking by force, fraud, or coercion and Title 18, United States Code, Chapter 110 – sexual exploitation and other abuse of children, including violations pertaining to sexual exploitation and attempted sexual exploitation of children (18 U.S.C. § 2251(a)), distribution or receipt of child pornography  (18 U.S.C. § 2252A(a)(2), possession of child pornography (18 U.S.C. § 2252A(a)(5)(B)). I am also familiar with the provisions of the Controlled Substances Act which prohibit both distribution and possession with intent to distribute (PWID)  controlled substances (21 U.S.C. 841(a)). I am also familiar with the federal statutes pertaining to wire fraud (18 U.S.C. §1343) and money laundering (18 U.S.C. §§ 1957 and 1957).   I am a federal law enforcement officer and, therefore, authorized by the Attorney General to request a Search Warrant under Federal Rule of Criminal Procedure 41.

2.      I make this Continuation in support of an application for a warrant to search cellular phones which were seized during the search of the residence of MARTELL

SCOTT-WARE on 4/24/2025, located at 947 Ballard St SE, Grand Rapids, MI. (MARTELL SCOTT-WARE also goes by MARTELL SCOTT, and will hereafter be referred to as "SCOTT.")

3.     The phones were seized pursuant to two warrants. The first warrant authorized the search of SCOTT's residence in order to locate and seize an iPhone 14. This warrant was authorized by United States Magistrate Judge Sally J. Berens in case number 1:25-MJ-221. While searching for this device, agents saw evidence of drug trafficking in plain view, so they sought an additional warrant. The same magistrate issued that  warrant in case number 1:25-MJ-223. This warrant permitted the seizure of evidence of violations of 21 U.S.C. § 841(a) (possession with intent to distribute controlled substances and distribution of the same) from SCOTT's residence. The warrant specifically authorized the seizure of cellular phones, and agents recovered multiple cellular phones besides the iPhone 14 during the search. Agents also recovered suspected controlled substances, stolen firearms, and a credit-card "skimmer," along with other evidence.

4.     I am seeking a warrant to search the cellular phones now in the possession of law enforcement for evidence of the following Target Offenses:

> (1) drug trafficking crimes committed in violation of 21 U.S.C. § 841;
>
> (2) firearms crimes committed in violation of 18 U.S.C. §§ 922(j) (possession of a stolen firearm) and 924(c) (possession of a firearm in furtherance of drug trafficking);
>
> (3) wire fraud and money laundering crimes committed in violation 18 U.S.C. §§ 1343 and 1956;
>
> (4) child sexual exploitation crimes committed in violation of 18 U.S.C. §

2251; and

     (5) sex trafficking crimes committed in violation of 18 U.S.C. § 1591.

5.     The place to be searched is described with particularity in Attachment A and the property to be seized is described with more particularity in Attachment B.

6.     The statements contained in this Continuation are based upon information acquired during my investigation, as well as information provided by others such as other police officers, and Task Force Officers (TFOs) and Special Agents of the FBI. Because this Continuation is being submitted for the limited purpose of establishing probable cause to secure a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts I believe necessary to establish probable cause to search for evidence of the Target Offenses.

### PROBABLE CAUSE FOR SEARCH WARRANT

**Magistrates in West Michigan Authorize Two Search
Warrants Concerning Martell Scott-Ware's iPhone**

7.     On April 17, 2025, United States Magistrate Judge Ray Kent issued a warrant authorizing the seizure and subsequent search of an Apple iPhone 14 Pro Max assigned IMEI: 35805791803103. (See 1:25-MJ-212.) As explained in the continuation submitted in support of that warrant, this device was controlled and used by MARTELL SCOTT-WARE, and was expected to contain evidence of violations of 18 U.S.C. § 1591 (sex trafficking of children); 18 U.S.C. § 2251 (sexual exploitation of a child); 18 U.S.C. § 2252A (receipt, distribution, and possession of child pornography), as well as 21 U.S.C. § 841(a)

distribution of and possession with intent to distribute controlled substances.

8.      On April 21, 2025, United States Magistrate Judge Sally J. Berens issued a warrant authorizing the collection of location data associated with the same device. (See 1:25-MJ-215.)

### Law Enforcement Personnel Locate Additional
### Evidence in Scott's Home While Searching for his Phone

9.      On April 24, 2025, United States Magistrate Judge Sally J. Berens authorized the search of SCOTT's residence on 947 Ballard Street for the iPhone 14 describe above. Law enforcement personnel began executing the warrant in the late afternoon/early evening of the same date.

10.     Law enforcement personnel surrounded 947 Ballard Street, announced themselves, and approached the residence to execute the warrant, all while wearing clothing that identified them as law enforcement personnel. SCOTT then exited out of a second story window onto an awning in the rear of the house. He jumped down from the awning into the back yard and attempted to flee over a fence. Law enforcement personnel apprehended him and detained him.

11.     An officer searched SCOTT's person after he was detained. He did not have any contraband on his person. He also did not have the Apple iPhone 14 in his possession. Accordingly, law enforcement personnel continued to search for this item in 947 Ballard Street.

12.     Law enforcement personnel began searching a bedroom that appeared to belong

4

to SCOTT. They observed one digital scale on top of a desk in a case. Upon opening a dresser drawer, an agent found a Backwoods pocket scale. In the same drawer, there was a coffee can containing $500 in bulk United States currency, consisting mostly of $20 bills. There was also a credit card "skimmer," i.e., a device used to copy credit and/or debit card information, along with approximately 30 or more cards that appeared to be Visa, debit, or blank cards stored in a box with the skimmer. There were not any food ingredients located on the desk or in the drawer.

13.    This evidence was significant to me based on my training and experience and based on other evidence seized in this investigation.

    a.  It is significant to me that two digital scales were found inside a bedroom, and that one of them was in close proximity to bulk U.S. currency. These scales were not located in a place where food is typically weighed out and measured, such as a kitchen. Rather, they were located in a bedroom without any food or food ingredients in close proximity. From this, I infer that these scales were likely not being used to weigh out food ingredients.

    b.  I also know from my training and experience that digital scales are common tools for drug traffickers to use, especially portable scales of pocket size. Drug dealers often use these tools to weigh out smaller quantities of illegal drugs before packaging them into distribution quantities for re-sale to customers.

    c.  I also know from my training and experience that drug trafficking is

primarily a cash-based business. Both dealers and customers often prefer to transact drug business in cash so that their illegal transactions do not generate financial records. I also know from my training and experience that drugs such as cocaine, heroin, and fentanyl are often sold in multiples of $20, with customers often placing orders as an expression of price, such as, "Can I get $40?" Therefore, the presence of not only bulk cash, but bulk cash consisting primarily of $20 bills is also consistent with drug trafficking.

14.    Earlier in this investigation, I have seen evidence indicating that SCOTT was selling cocaine for profit in April of 2024. This evidence consists primarily of text messages between SCOTT, a woman named Shauntelle BLACKMON, and a minor female whom I will refer to as Minor Victim 1 (MV1). In those conversations, the parties made references to "snow," "hard," and "coke." Investigators recovered these messages from a search of BLACKMON's cellular device, as well as a search of Minor Victim 1's device.

15.    For example, Around 4/15/2024, BLACKMON and SCOTT had this exchange (Blackmon's phone):

    a.  BLACKMON and SCOTT began a text conversation. SCOTT instructed BLACKMON to create an OnlyFans account and said he could get hotel rooms half off. SCOTT told BLACKMON to show him her skipthegames account so he could see if it needed to be more creative. SCOTT said "Ima

be on yo ass ima make sure u make some money u know some people who do coke?"  and BLACKMON replied, "I do it sometimes 😩😩 I need a lil waker upper". Later, it appeared SCOTT provided drugs to BLACKMON and MV1 after BLACKMON told SCOTT she was sleepy. SCOTT said that "We got it its down the st doe come on". After approximately 1.5 hours had passed, the following conversation was had:

> **Blackmon**: This shit 💧
>
> **Scott**: Always is thanks
>
> **Scott:** She do it too
>
> **Blackmon:** Yea don't tell her I told u
>
> **Blackmon:** Yea I don't do it frfr just to stay up and active
>
> **Scott:** I wouldn't do that
>
> **Scott:** Ysll can trust me

16.    As another example,  around 4/17/2024, BLACKMON, SCOTT, and MV1 had a group text conversation together and had the following exchange (Blackmon's Phone):

    a.  MV1 sent the message "We're here park down the road" and SCOTT responded "I know bet on my way I aint far". The next message he sent was approximately 45 minutes later and was "I went to the kitchen babies had to go cook up I was running low on hard".

        i.  Based on my training and experience, I know the term "hard" can refer to illegal drugs, such as cocaine.

17.     The presence of bulk U.S. currency and digital scales in SCOTT's residence and likely bedroom approximately one year after the above messages were sent leads me to believe that SCOTT was still engaged in the illegal distribution of controlled substances up to the date his home was searched. His attempted flight from the residence, in the context of the other evidence in his home, also suggests to me that SCOTT was conscious that his home contained illegal contraband and/or evidence of criminal activity.

**Information Concerning Drug Trafficking Evidence**

18.     I know from my training and experience that drug traffickers often maintain more than one cellular phone in order to maintain separate lines of communication with their suppliers and/or customers. Multiple phones in the possession of one drug dealer are thus each likely to contain evidence of drug trafficking.

**Agents Obtain Another Warrant, then Seize
Additional Evidence from SCOTT's Home**

19.     After finding the above-described items in the drawer that was opened, investigators sought and obtained an additional warrant that permitted them to seize evidence of drug trafficking crimes committed in violation of 21 U.S.C. § 841(a). United States Magistrate Judge Sally J. Berens authorized this warrant in case number 1:25-MJ-223. The warrant specifically authorized the seizure of evidence of violations of 21 U.S.C. § 841(a), to include firearms, digital scales, cellular phones, bulk United States currency; and money laundering tools (such as credit card skimmers).

20.     Agents found and seized multiple items of evidence pursuant to this expanded

warrant. Those items included:

    a.  Suspected heroin and methamphetamine (lab results are still pending);

    b.  A stolen AK-47 style rifle;

    c.  A stolen Glock pistol;

    d.  A pistol with a serial number on the slide that did not match the serial number on the frame; one serial number traced back to a handgun that belonged to the victim of a homicide that occurred in/around Wyoming, Michigan within the last five years;

    e.  A credit card "skimmer," along with blank cards and Bridge benefit cards not in SCOTT's name;

    f.  $500 in United States currency;

    g.  The following cellular phones were seized from SCOTT's bedroom:

        i.  Apple iPhone 14 Pro Max – Gray in a black and green case;

        ii.  Apple iphone 11 – Black/brown case;

        iii.  Blu Smartphone;

        iv.  Sharp Verizon phone, S/N STTM21VAPP;

        v.  Apple iPhone, red;

        vi.  TCL flip phone;

        vii.  Vortex phone;

        viii.  Apple iPhone, black;

        ix.  Orbic flip phone;

21.     On 4/25/2025, SCOTT's a data acquisition was conducted of SCOTT's Apple iPhone 14 Pro Max. (A separate warrant authorized in case number 1:25-MJ-212 by United States Magistrate Judge Ray Kent already permitted the seizure and search of this device.) The extraction of the device was later processed and a digital review was conducted to search for evidence of sex trafficking and drug trafficking, as well as evidence of money laundering, which could be used for converting illegally gained proceeds into forms that could be spent elsewhere. During the review, evidence of possible financial fraud was located:

**Unemployment Fraud**

    a.   A photo of a phone screen, depicting an Unemployment Insurance Benefits Online claim, for a person named Paul Siconolfi. The weekly benefit amount was for $504.00 with a maximum amount payable of $13,104.00. The latest transaction from the claim was 3/15/2021.

    b.   A photo of a direct deposit into an online banking account for $8,868 from "Odjfs-pau Federal" [Note: the term "Odjfs-pau Federal" was searched via Google, which revealed it was from the Ohio Pandemic Unemployment Assistance program.]

    c.   A photo of a phone screen that depicted a confirmation from the State of Arizona Benefitpay, that a payee received a payment of $417.00.

    d.   A photo of a Benefit Payment History claim for Joseph F. Borzellere, starting on 11/30/2020, for a weekly benefit amount of $182.00. The latest

10

transaction was on 3/12/2021.

    i.  These photos were significant to me in part because of the card-skimming equipment that was recovered during the search of SCOTT's bedroom.  That equipment was found in close proximity to several Bridge (unemployment benefit) cards that were not in SCOTT's name. Collectively, these items and the photos concerning unemployment-benefit payments are consistent with SCOTT's involvement in a scheme to fraudulently obtain and spend unemployment benefits.

**Unexplained Income and Payments**

22.    During a custodial interview with SCOTT on 4/24/2025, SCOTT told investigators that his source of income was from taking care of his mother, in some sort of home health care capacity. He claimed he made roughly $500 every two weeks from doing this. Even so, the data extraction of the iPhone 14 contained:

    a.  A photo of a phone that depicted what appeared to be an online Wells Fargo account displayed on it. The account showed a pending transaction of a $55,000 Federal Tax refund, dated 2/16/2021.

    b.  A photo of a phone screen that depicted what appeared to be an online financial account, that showed a direct deposit of $8,868.00. Another screenshot of the same type of account was found with another direct deposit of $2,932.00.

11

    c.  A photo of what appeared to be a CashApp account, with a balance of $25,081.75.

    d.  A photo of a bank receipt for Bank of America account which showed a checking account balance of $18,200.

    e.  A photo of a phone with a broken screen, that displayed a Bitcoin wallet with $4,082.55 in it.

    f.  A photo of three phones, which all displayed what appeared to be Cash App accounts on them. The cash balances for the three accounts where: $31,858.89, 47,915.82, and $19,025.3 (last digit was not observed in the photo).

    g.  A screenshot of an online payments from user "Love Money" to user "$nooniehendrix" for $8,000.

    h.  A screenshot was found in which a $1,500 payment was made to user "Stef", username "$stefxnmp".

    i.  A screenshot of a payment, which appeared to be sent via CashApp, for $5,000 was sent to "Harriet Powlson.

    j.  A photo of a payment to user GERQUAT, username "skyyy96" for $7,000.

    k.  A screenshot of a CashApp payment to "nina blue" for $1,000.

23.    Investigators also recovered evidence of drug trafficking crimes from the extraction of SCOTT's iPhone 14.

    a.  For example, in messages with contact "Tanaa Rae" investigators observed

the following:

    1. On 1/17/2025, Tanna Rae sent the message "G if hard."

    2. Tanna Rae then placed an audio call that lasted approximately 18 seconds.

    3. SCOTT then responded with the message, "Boy?"

    4. Tanna Rae replied, "G of hard raddison/No boy."

    5. Scott then messaged, "Finna cook 30-4 [sic] mins"

ii. From my training and experience, I know that "hard" is a slang term for crack cocaine, and I know that "cook" is a term used for the process of making crack cocaine from powder cocaine. I also know that "boy" is a slang term for heroin/fentanyl. Based on this knowledge, I interpret the above messages as Tanna Rae placing an order for 1 gram (a "G") of crack cocaine. SCOTT then asks if Tanna Rae also wants any heroin. Tanna Rae responds by confirming her order for 1 gram of crack and suggests a meet location ("raddison"). She adds that she does not want heroin ("no boy"). SCOTT then tells Tanna Rae that he is going to cook some powder cocaine into crack cocaine for her, and that it will take approximately 30-40 minutes.

24. Investigators also recovered evidence of child exploitation from SCOTT's iPhone

13

14. This evidence included videos depicting SCOTT and BLACKMON engaging in penetrative sexual activity with MV1 in SCOTT's bedroom. MV1 was 15 years old at the time the videos were recorded.

25.    In his custodial interview on 4/24/2025, SCOTT confirmed that he was the person depicted in these videos, though he denied knowing MV1's age at the time the sexual activity occurred.

## CONCLUSION

26.    The recovery of the above-described evidence indicates that SCOTT is involved in a broad array of criminal activity, to include violations of the Target Offenses.

27.    Therefore, based on the information described above, I submit there is probable cause that a search of the cellular devices described above and in Attachment A will yield evidence of the Target Offenses. I request that this Court authorize a search of the property described in Attachment A for the property/evidence described in Attachment B.